UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:12-cr-102 |
| | ) | |
| v. | ) | |
| | ) | *Mattice / Lee* |
| | ) | |
| PATRICK J. WINTERS | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant Patrick J. Winters ("Defendant")

seeking to suppress all evidence resulting from the search of a rental vehicle involved in a traffic

stop on August 9, 2012 [Doc. 22]. Defendant, who was a passenger in the stopped vehicle, mainly

alleges the search was unconstitutional due to a lack of reasonable suspicion to justify extending the

scope and duration of the stop. After considering the evidence and arguments, I **RECOMMEND**

that Defendant's motion to suppress be **DENIED**.[1]

## I.    FACTS

The one-count Indictment charges Defendant with possession with intent to distribute one

kilogram or more of heroin [Doc. 15]. At the hearing, the government offered the testimony of

Chattanooga Police Department ("CPD") Officer Jason Duggan. Defendant offered the testimony

of Robin Winters. While conclusions to be drawn from the events of the stop are in dispute, the

events themselves, most of which were captured on Officer Duggan's recording equipment, are

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and (C) [Doc. 24]. The motion is fully briefed: Defendant filed a supporting
memorandum [Doc. 23], the government filed a brief in opposition [Doc. 25], and Defendant filed
a reply [Doc. 28]. An evidentiary hearing on the motion was held on December 21, 2012.

largely undisputed.

### A. Officer Duggan's Testimony

Officer Duggan testified as follows:

#### 1. The K-9 Unit

Officer Duggan is a canine-handling officer who patrols in a K-9 unit assigned to the CPD's Highway Interdiction Team. Duggan has been certified to work with two drug-detection dogs in his tenure. During the incident at issue, he and a drug-detection dog named Red were trained and certified to work as a team. Officer Duggan, who has been employed by the CPD for seven years, worked with Red from May 2008 until shortly after the incident at issue. Red is a single-purpose, active alert drug-detection dog. Red and Officer Duggan were certified annually by the United States Police Canine Association, with their last certification on March 28, 2012 [Government's Exhibit D].

As relevant here, Red was typically "trained" by Officer Duggan twice a month unless Officer Duggan was on vacation, in school, or otherwise unavailable. Red and Officer Duggan participated in training roughly twice a month in 2010 and 2011. In 2012, the team's training was somewhat less regular: in January, Red and Officer Duggan trained twice; in February, Red could not train as a result of health issues; in March, Red and Officer Duggan trained three times (twice in one day); in April and May, training took place only once per month; and in June and July, training took place twice per month, with the last training prior to the stop taking place on July 25, 2012. Red and Officer Duggan won regional competitions based on Red's drug detection skills in 2011 and Red performed perfectly in all of his 2012 training according to Officer Duggan.

Red experienced seizures and vomiting prior to 2012. In February of 2012, Red was

experiencing more frequent seizures and increased vomiting and had also developed heart worms and tumors. His training, however, was not diminished due to illness except for the month of February 2012. The only explanation offered for the reduced training in April and May of 2012 was that Officer Duggan may not have been available. Officer Duggan testified credibly that Red's health did not negatively impact his drug detection ability or performance and that Red maintained his skills to detect narcotic odors. However, Red exhibited a diminished energy level in everyday activities and seemed to lose his "drive" to work, although he maintained high energy in the search process. Red was retired shortly after his deployment in this case due to his diminished drive to work, not because of any particular health concern.

## 2. The Stop

Around midnight on August 9, 2012, Officer Duggan was on patrol with Red when, at four minutes after midnight, he stopped a Hertz rental vehicle for speeding 72 mph in a 55 mph zone on westbound I-24 in Chattanooga, Tennessee.[2] Officer Duggan approached the passenger side of the vehicle and spoke to the driver of the car, Jessica Harris. Ms. Harris acknowledged she was driving 70 mph and stated she did not realize the speed limit had changed from 70 mph in Georgia to 55 mph in Tennessee. She said she was coming from Georgia on her way to Memphis and she had a Memphis address on her driver's license. Officer Duggan noticed immediate signs of nervousness

---

[2] The entire stop is captured on Officer's Duggan's video and audio recording equipment [Government's Exhibit A], except there is no audio from the time Officer Duggan began the process of placing Red back into the patrol car after Red's alert until the search. The parties specifically did not submit evidence of events captured by the recording equipment after the search of the car. With respect to the missing audio, Officer Duggan stated the process of getting Red back into the patrol car after an alert was always difficult, and even more so on the night at issue. Thus, he regularly turns his audio equipment off during the process of placing Red back in the patrol car. Officer Duggan forgot to turn his audio recording equipment back on. Defendant made no specific argument regarding the lack of audio recording as it relates to the issues before the Court.

3

from Ms. Harris based on her facial expressions. He found it odd that she directed her apologies for speeding to Defendant, the sole passenger in the vehicle, instead of to him. She was trembling when she handed her license to Officer Duggan. Based on his experience of making more than 1,000 traffic stops, Officer Duggan thought Ms. Harris exhibited above average (at times described as extreme) nervousness for an average motorist in a traffic stop.

Upon Officer Duggan's request for paperwork on the rental, Defendant provided all of the vehicle's registration paperwork to Officer Duggan. When Officer Duggan asked for just the rental agreement and Defendant's license, Defendant complied by giving both the rental agreement [Government's Exhibit B] and his license to Officer Duggan. Officer Duggan thought Defendant's initial behavior in providing the entire package of vehicle paperwork was unusual. Defendant said he was responsible for the car, which was rented by his cousin.

Officer Duggan returned to his patrol car with the drivers' licenses and the rental car contract at 12:08 a.m. and told his supervisor over his radio that the stop "might be something interesting" in order to alert the rest of the interdiction team on patrol that night of a possible need for backup. From the rental car paperwork, Officer Duggan learned the car was rented by Robin Winters in Atlanta at 7:45 p.m. the day before (roughly four hours prior), Ms. Winters was the only listed authorized driver, and the rental car was a third-party, one-way drop off from Atlanta due in Chicago at 5:00 p.m. the day of the stop. Officer Duggan found this suspicious because Ms. Harris had said she was going to Memphis. He thought it suspicious that neither occupant of the car was an authorized driver and he also thought it suspicious that a car rented for less than 24 hours was going "out of the way" to Memphis through Chattanooga to Chicago. Officer Duggan checked Ms. Harris's license and determined it was valid. He could not recall if he checked Defendant's license.

At 12:12 a.m., Officer Duggan asked Ms. Harris to get out of the car and speak with him in the area in front of his patrol car. He testified this is his routine practice because of the dangers and difficulties hearing a driver during an interstate highway stop. Officer Duggan began writing the warning ticket and told Ms. Harris he intended to issue her a warning ticket that would not involve a fine or impact her insurance. He testified he told her this in order to eliminate any normal nervousness about the possibility of a speeding ticket and to eliminate any flight response since he was giving her the impression she would be free to leave soon. From his conversation with Ms. Harris, Officer Duggan learned, among other things, that: (1) Ms. Harris had been living in Atlanta; (2) Defendant was her cousin and traveled frequently from Chicago to Atlanta; (3) Ms. Harris and Defendant were traveling to Memphis to visit Ms. Harris's family and rest and then traveling on to Chicago where Defendant would stay; (6) Ms. Harris was flying back to Atlanta after about one day in Chicago; and (7) the car was rented by another cousin. Ms. Harris did not mention Chicago until Officer Duggan asked where she was traveling after Memphis. At 12:17 a.m., Officer Duggan told Ms. Harris he would finish with the warning citation after speaking to Defendant about the rental contract. On cross examination, Officer Harris said he was finished with the speeding violation as "speeding had been addressed." Officer Harris also testified he had not completed the section of the warning ticket regarding consent to search and said he completes this section of the warning ticket on every warning he writes.

Based on events up to this point, Officer Duggan was suspicious that Ms. Harris was traveling out of her way by coming from Atlanta through Chattanooga (instead of Birmingham) and including a stop in Memphis, which was "significantly out of the way" to Chicago, in a 24-hour

rental period and then returning to Atlanta only one day later.[3] Officer Duggan knew it would take five or six hours to get to Memphis and he thought these travel plans were "geographically implausible" and inconsistent with Ms. Harris's stated purpose of a rest and visit with her father in Memphis. Officer Duggan was suspicious that neither occupant of the car was on the rental agreement and that Defendant handed him the entire vehicle registration paperwork. He also thought both Ms. Harris and Defendant acted more nervous than the usual motorist facing a traffic violation. In addition, he thought Ms. Harris acted suspiciously and nervously in addressing her apologies for speeding to Defendant.

Leaving Ms. Harris in front of his patrol car, Officer Duggan then approached and questioned Defendant. As Officer Duggan walked up to the car, Defendant was talking on his cell phone but quickly hung up mid-sentence, which Officer Duggan thought was suspicious. In their interaction Defendant told Officer Duggan: (1) his cousin rented the car; (2) they were going to Memphis for about two days; (3) Ms. Harris was going to fly back to Atlanta from Memphis; (4) he would drive from Memphis to Chicago; (5) his record label was going to pay for Ms. Harris's plane ticket; and (6) he was responsible for the rental car and his cousin could easily add time to the rental contract or pay a late fee. Officer Duggan thought Defendant was nervously engaged in excessive talking during this encounter and found it suspicious that Defendant did not bring up that he was traveling to Chicago until Officer Duggan asked where he was going after Memphis. In addition,

---

[3]  While Officer Duggan did not know the travel time to Chicago and had never driven to Chicago at the time of the stop or at the time of his testimony, he viewed a Google map in preparation for his testimony and testified (without objection) that the route from Atlanta to Chicago would go through Chattanooga, but going via Memphis would change the route to pass through Birmingham and would add 200 miles to the trip. Traveling through Chattanooga instead of Birmingham on the same route to Chicago via Memphis would add an additional 80 miles to the trip.

6

Officer Duggan was also observing Ms. Harris who was acting very nervous by dancing and moving around as she waited in front of his patrol car. Confident there was criminal activity afoot, at 12:21 a.m. Officer Duggan called for immediate backup as he continued to talk to Defendant.

Still suspicious, at 12:21 a.m., Officer Duggan went back to Ms. Harris to ask about the inconsistencies between her and Defendant's answers regarding their travel plans. Officer Duggan thought Ms. Harris seemed surprised when he told her Defendant said they were to stay in Memphis for two days. Officer Duggan obtained Ms. Harris's telephone number to add to the warning ticket. Officer Duggan then asked Ms. Harris if there was anything illegal in the car. Ms. Harris denied possessing anything illegal, including a laundry list of drugs. Officer Duggan believed her behavior changed when she denied having any packages in the car. She claimed only one bag in the car noting the other bag belonged to Defendant. Ms. Harris also denied consent to search when asked for consent at 12:24 a.m. Officer Duggan had Ms. Harris sign the warning ticket at 12:24 a.m. [Government's Exhibit C] and told her he was going to deploy Red on the car. Officer Duggan asked if Ms. Harris was responsible for everything in the car, and she responded she was only responsible for her purse and one bag. She also said she did not know if Defendant was on parole.

As Officer Duggan started to again call for backup at 12:25 a.m., CPD Sergeant Lewis pulled up to his location. Officer Duggan then went back to Defendant and said he was still confused about his and Ms. Harris's travel plans. Defendant said he was responsible for all items in the car and admitted ownership of his bag in the car. Officer Duggan asked Defendant if there was anything illegal in the car and if he would give consent to search. Defendant responded by saying there was nothing illegal in the car and something to the effect of "you can do whatever you want to do" and "yeah, go ahead." Officer Duggan did not accept these statements as voluntary consent. So, at

12:27 a.m., Officer Duggan asked Defendant to step out of the car and engaged in a consensual pat-down of Defendant.

Officer Duggan then deployed Red around the vehicle. Initially Red seemed interested in the odors around Defendant. When he was deployed at the car at 12:28 a.m., Red immediately alerted to the presence of the odor of narcotics at the passenger side door area, instead of starting his sniff at the front of the car as was his custom.

While the two officers were engaged in placing Red back into the patrol car, apparently with some difficulties, Defendant threw a small bag of marijuana from his pants into the grass along the road. Officer Duggan believes Red initially reacted to Defendant because of the marijuana.

Officer Duggan returned to Ms. Harris and Defendant and explained Red's alert.[4] Officer Duggan told them if there was a small amount of drugs and one of them admitted possessing it, then he would "work with them." Defendant admitted to possessing a small amount of marijuana which he had thrown in the grass along the highway during the stop. Defendant helped Officer Duggan retrieve the small bag of marijuana.

The rental vehicle was searched at 12:32 a.m. and a kilogram package of heroin was found in Defendant's bag in the back seat a few minutes into the search. Both Ms. Harris and Defendant were arrested.

**B.    Robin Winters' Testimony**

Ms. Winters, Defendant's cousin and the individual who rented the vehicle, testified as follows:

Ms. Winters lives north of Atlanta, Georgia and is originally from Chicago. She has known

---

[4] From this point on, there is no audio recording of the events as previously noted.

Defendant all her life, but this was the first time Defendant had ever visited her in Atlanta. Defendant called her at work on August 8, 2012 and asked if she would rent a car for him to drive to Chicago because he did not have a credit card. The two agreed that Ms. Winters would rent the car using her credit card and Defendant would pay her back in cash.

Later that day, Ms. Winters booked the rental on the Hertz website for one day because she assumed Defendant was going straight to Chicago. After the rental was booked, Defendant and a woman (apparently Ms. Harris) met Ms. Winters at her home, they all went to the bank to get cash so Defendant could pay her back for the rental, and they drove separately to the airport to pick up the rental car. Ms. Winters' reservation would not load on the self-service Hertz kiosk at the airport so she contacted a representative using the kiosk phone. While her reservation was being confirmed and processed to have documentation sent to the kiosk, Ms. Winters asked the representative to add Defendant to the reservation, and she gave the phone to Defendant to provide the necessary information to the representative while she went to the bathroom.

Although the rental contract has language about whether fees are included for other drivers, Ms. Winters was not quoted a higher price for adding an additional driver to her reservation. Ms. Winters did not look at the rental contract documentation after it was printed to the kiosk and simply put the documentation in the rental car and she and Defendant (and the woman) parted ways. Ms. Winters did not know Defendant was planning to go to Memphis and would probably have rented the car for more than a day if she had known more about his travel plans, but she did not care where Defendant took the car. Ms. Winters knew there was an option to extend the rental contract past the time the car was due.

9

## II.    ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV.[5]  Within the meaning of the Fourth Amendment, an ordinary traffic stop is considered an investigative detention governed by the principles established in *Terry v. Ohio*, 392 U.S. 1 (1968).  *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).  Under *Terry*, this Court must determine whether the stop was "justified at its inception," and then "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.

Stopping a motorist is a seizure of all occupants of the vehicle under the Fourth Amendment. *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (Passengers of a vehicle "are also considered seized during a traffic stop.").  Therefore, a passenger in a vehicle stopped by the police may contest the legality of the stop and, by extension, may seek the suppression of the fruits of any illegal seizure.  *See United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008).  Ultimately, "[i]t is the [government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

### A.    The Stop

The stop involved a total of 25 minutes from initiation until Red's alert. In addressing

---

[5]  The government initially raised an issue regarding whether Defendant had a reasonable expectation of privacy to challenge the search of the rental car (although conceding he could challenge the search of his bag where the heroin was found) based on Red's alert.  The government waived its arguments concerning Defendant's "standing" to challenge the car search for purposes of the motion to suppress at the conclusion of the evidentiary hearing, however, so it is not necessary to address the issue of whether Defendant had a reasonable expectation of privacy in the rental car herein.

10

Defendant's motion, it is important to acknowledge the first part of the analysis of the reasonableness of the stop –which was justified by Officer Duggan's observation of speeding– is not in dispute because Defendant does not challenge the legality of the stop. Defendant instead focuses on the second part of the analysis contending Officer Duggan's conduct, both when he engaged in extraneous questioning and when he deployed Red, was not reasonably related to the speeding violation. Thus, it is undisputed that the following events of the stop all occurred within the scope and duration of the original purpose of the stop:

| Time in A.M. | Events |
|---|---|
| 12:04 | Stop initiated |
| 12:06 | Officer Duggan approaches vehicle and speaks with occupants |
| 12:08 | Officer Duggan returns to the patrol car to review documents and license(s) |
| 12:12 | Officer Duggan asks Ms. Harris to step out of car, begins to write a warning ticket for speeding as he questions her about various matters such as her travel plans, the rental car, and Defendant |
| 12:17 | Officer Duggan has finished addressing speeding with Ms. Harris and has completed most of the warning ticket, but decides to question Defendant |

Defendant argues the original purpose of the stop was completed by 12:17 a.m. and he challenges all of Officer Duggan's actions as unconstitutional from this point forward. The following events took place from 12:17 a.m. to 12:24 a.m., which is when the government concedes the original purpose of the stop was completed:

| 12:17 | Officer Duggan approaches to talk to Defendant about his travel plans, Ms. Harris, and related matters |
| 12:21 | Officer Duggan calls for backup at 12:22 a.m., returns to speak with Ms. Harris, and continues to fill out the warning ticket by adding her phone number |

| 12:23 | Officer Duggan continues to question Ms. Harris and seeks consent to search, which is refused |
|-------|------------------------------------------------------------------------------------------------|
| 12:24 | Officer Duggan asks Ms. Harris to sign the warning ticket and she does so |

As the stop was proper, the Court will turn to the issue of whether the degree of intrusion was "reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (citations and internal quotation marks omitted). As recently reiterated by the Sixth Circuit,

> A valid *Terry* stop must be "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). To be limited in scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. To be limited in duration, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.*

*United States v. Cochrane*, __ F.3d __, 2012 WL 6621131, at * 3 (6th Cir. Dec. 20, 2012).

Alternatively, the police may extend a stop beyond the scope of what was originally permissible if "something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *Davis*, 430 F.3d at 353 (internal quotation marks and alterations omitted). "[W]ithout such reasonable suspicion, all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference.'" *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (quoting *Hill*, 195 F.3d at 264).

### 1. Was The Stop Concluded at 12:17 a.m.?

The parties dispute exactly when the purpose of the stop, ostensibly made to investigate a speeding violation, was concluded. Defendant contends the stop was concluded at 12:17 a.m. when

Officer Duggan admits that he had completed most of the warning ticket and that speeding had been addressed. The government contends the purpose of the stop was not concluded until 12:24 a.m. when Ms. Harris's phone number was added to the warning ticket, consent to search was refused, and the warning ticket was signed by and given to Ms. Harris. Accepting neither view as totally adequate, I **FIND** Officer Duggan had not completed the stop at 12:17 a.m.; he instead extended the not-yet-completed stop by failing to complete the warning ticket once he admittedly finished addressing the speeding violation at 12:17 a.m. Thus, the relevant inquiry is whether Officer Duggan unreasonably extended the not-yet-completed stop when he decided to question Defendant rather than finish the warning ticket.

### 2. Was The Stop Unreasonably Extended Beyond 12:17 a.m.?

Although the Sixth Circuit has not adopted a bright-line ban on any questions unrelated to the traffic violation that prolongs a traffic stop, *see Everett*, 601 F.3d at 492, the Sixth Circuit has recognized that extraneous questioning might prolong a not-yet-completed stop because an officer might unreasonably delay completing the purpose of the stop if all the time addressing the violation is excluded as reasonable. "Because a crafty officer . . . may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, we also treat the unreasonable extension of a not-yet-completed traffic stop as a seizure." *Stepp*, 680 F.3d at 662 (citations omitted). An officer may not simply abandon or delay writing a ticket, citation, or warning ticket in order to propound questions to motorists and their passengers. *See*

13

*Stepp*, 680 F.3d at 662.[6]

The overarching inquiry is one of reasonableness. *Everett*, 601 F.3d at 493-94. To evaluate

the reasonableness of the prolongation of a stop, a court considers the diligence of the officer with

an eye towards both the duration of the officer's extraneous questioning and the subject matter of

the questions. *Id.* at 494. With respect to subject matter, questions relating to travel plans, the

driver's authority to operate the vehicle, or the safety of the officer are "context-framing questions"

that "do not bespeak of a lack of diligence." *Id.* 494-95. Thus, a court "must conduct a fact-bound,

context-dependent inquiry in each case" to determine whether the "'totality of the circumstances

surrounding the stop' indicates that the duration of the stop as a whole—including any prolongation

due to suspicionless unrelated questioning—was reasonable." *Id.* at 493-94 (citations omitted). An

officer's "subjective intent or hope to uncover unrelated criminal conduct" through such

questioning, however, "is irrelevant." *Id.* at 495 n. 12 (citing *Whren v. United States*, 517 U.S. 806,

813 (1996)). The key inquiry is "whether the police diligently pursued a means of investigation that

was likely to confirm or dispel their suspicions quickly." *Id.* at 494 (quoting *United States v. Sharpe*,

470 U.S. 675, 686 (1985)). If the officer is not diligent and unreasonably extends the stop with

_____

[6] In *Stepp*, a case not addressed by either party, the Sixth Circuit cited to *Everett* as creating a bright-line rule that any extraneous questioning that prolonged a stop was an unreasonable extension even if it was de minimis. *Stepp*, 680 F.3d at 662 (citing *Everett* for the proposition that "[w]hen the initial stop has concluded, we have adopted a bright-line rule that any subsequent prolonging, even de minimis, is an unreasonable extension of an otherwise lawful stop."). *Everett*, however, instead crafted an inquiry to determine the reasonableness of the entire stop by analyzing the totality of the officer's conduct, which will be addressed *infra*. The *Stepp* court held an unreasonable extension of a not-yet-completed traffic stop may occur in as little as six minutes of extraneous questioning. *Id.* at 661-63 (finding six minutes of extraneous questioning unreasonably prolonged a traffic stop). Yet, "[a] traffic stop is not 'measurably' extended by extraneous questioning even when such questioning undeniably prolongs the stop to a minimal degree." *Id.* at 662.

extraneous questioning, however, there must be reasonable suspicion to warrant the prolongation, as noted above.  *See Stepp*, 680 F.3d at 663-64; *Townsend*, 305 F.3d at 541.

From 12:17 a.m. to 12:22 a.m., Officer Duggan questioned Defendant about his travel plans, Ms. Harris's travel plans, and the rental car.  Most, if not all, of Officer Duggan's questions in this case were of the context-framing type of questions deemed reasonable in cases such as *Everett* and *Stepp*. There is nothing about the subject matter of Officer Duggan's questions to Defendant to suggest a lack of diligence on his part in conducting the traffic stop.  Therefore, I **FIND** Officer Duggan did not unreasonably extend the not-yet-completed stop by engaging Defendant in further conversation from 12:17 a.m. until 12:22 a.m. when he returns to Ms. Harris to complete the warning ticket, which was finally signed at 12:24 a.m.  Officer Duggan was diligent in working towards completion of the stop and, taking the stop as a whole, the additional questioning did not measurably prolong the stop in an unreasonable way.  The time taken to complete the warning ticket from 12:22 a.m. until 12:24 a.m. did not extend the stop as it was time that would have been necessary to complete the paperwork (if Officer Duggan had done so) at 12:17 a.m. as well.

### 3.     Was There Reasonable Suspicion at 12:24?

After Ms. Harris was given the warning ticket and the stop was concluded at 12:24 a.m. by the government's admission, the following events occurred:

| 12:25 | Officer Duggan returns to speak to Defendant |
|-------|----------------------------------------------|
| 12:26 | Officer Duggan asks Defendant for consent to search and does not consider Defendant's response to be valid consent |
| 12:27 | Officer Duggan asks Defendant to exit the vehicle |
| 12:28 | Officer Duggan deploys Red |
| 12:29 | Red alerts |

15

Normally, a dog sniff does not require separate reasonable suspicion because it is not a search under the Fourth Amendment. *Stepp*, 680 F.3d at 663 (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *Bell*, 555 F.3d at 541-42 (a slight deviation from the initial purpose of traffic stop to call for and deploy a drug-detection dog around vehicle would not require separate reasonable suspicion). If the dog sniff was conducted while a suspect was properly seized as a result of a lawful traffic stop, "the dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably prolongs the initial stop and the officer lacked an independent reasonable suspicion to extend the stop." *Stepp*, 680 F.3d at 663. Here, it appears undisputed that Defendant was no longer properly seized as a result of a lawful traffic stop at the time Red was deployed as the purpose of the stop was completed a few minutes prior when the warning ticket was signed.

Red was in the patrol car and Officer Duggan's backup arrived at 12:25 a.m., one minute after the warning ticket was completed. While I **FIND** it only took a short time to deploy Red once the traffic stop was concluded at 12:24 a.m., it was still an extension of the stop beyond its original purpose and is a new Fourth Amendment event that resets the *Terry* clock. *See United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012). Therefore, Red's deployment is a prolongation of the stop after its completion, which begs the question: could Officer Duggan prolong the stop beyond what was originally permissible (i.e., 12:24 a.m.) because something happened to cause him, objectively, to have a reasonable and articulable suspicion that criminal activity was afoot?

Whether an officer has a reasonable and articulable suspicion sufficient to justify an extended detention depends on "the totality of the circumstances presented to the officer." *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012). "Police officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative

information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation marks and citation omitted). An officer's subjective belief about what he is investigating, however, is irrelevant. *Johnson*, 482 F. App'x at 143. It is the government's burden to point to specific facts, and describe how those facts would lead a reasonable officer to suspect criminal activity was afoot. *Id.* If the officer has a reasonable and articulable suspicion of criminal activity, he may extend a traffic stop long enough to confirm or dispel his suspicions. *Royer*, 460 U.S. at 500.

Turning to the issue of reasonable suspicion at 12:24 a.m., the government argues a reasonable officer would suspect criminal activity was afoot for the following reasons: (1) Ms. Harris and Defendant were traveling out of their way by coming from Atlanta through Chattanooga to Memphis on the way to Chicago in a 24-hour rental period; (2) conflicting information was provided by Ms. Harris and Defendant about when Ms. Harris would be returning to Atlanta and how long they would be staying in Memphis; (3) neither occupant of the car was listed on the car rental agreement as an authorized driver; (4) Defendant handed the entire vehicle registration paperwork to Officer Duggan instead of just the rental contract; (5) Ms. Harris and Defendant acted more nervous than the usual motorist facing a traffic violation, including that Ms. Harris engaged in a wide range of motion while Officer Duggan talked to Defendant and Defendant engaged in excessive talking; (6) Defendant and Ms. Harris did not initially bring up that they were traveling on to Chicago; (7) Ms. Harris's behavior changed when she denied having any packages in the car; (8) Defendant hung up his phone mid-sentence upon Officer Duggan's approach to speak with him; and (9) Ms. Harris addressed her apologies for speeding to Defendant, not to Officer Duggan.

Defendant relies on *Johnson*, 482 F. App'x 137, to argue Officer Duggan did not have a

reasonable and articulable suspicion of criminal activity sufficient to justify extending the traffic stop beyond 12:24 a.m. In *Johnson*, the very same Officer Duggan extended a traffic stop by approximately 19 minutes to bring in a drug-sniffing canine based on the Mr. Johnson's nervous behavior and lack of conventional luggage for his trip, the disconnect between the rental-car contract's geographical limitations and Mr. Johnson's stated travel plans, and the presence of industrial strength degreaser in the vehicle. Noting that whether Officer Duggan's suspicion of criminal activity was reasonable in light of these facts was a close question, a majority of the panel found it was not reasonable in the totality of the circumstances and, thus, Mr. Johnson should not have been detained after the citation was written. *Id.* at 144-48.

As in *Johnson*, here Officer Duggan clearly believed criminal activity was afoot. The question remains, however, as to whether his belief was reasonable given the totality of the circumstances. In *Johnson*, the Sixth Circuit stated that its reasonable-suspicion decisions did not offer a coherent principle to resolve the question of what constituted reasonable suspicion in any particular case and noted the Supreme Court also has recognized that, in the course of adjudicating reasonable suspicion, one decision "will seldom be a useful precedent for another." *Id.* at 147-48 (collecting cases; internal quotation marks and citations omitted). That being said, this Court must determine whether Officer Duggan had reasonable suspicion to detain Defendant after he finished writing the warning ticket.

Addressing the articulated reasons for Officer's Duggan's suspicion, it is well-established that nervousness is a weak indicator of criminal activity and, thus, it is routinely given little weight as a reasonable suspicion factor. *See e.g., Stepp*, 680 F.3d at 665; *Johnson*, 482 F. App'x at 145. Ms. Harris and Defendant's late night and "implausible" travel plans were somewhat dubious, however, and were entitled to some weight as an indicator of criminal activity in the context of a 24-

18

hour car rental. *See Stepp*, 680 F.3d at 665. In addition, neither occupant of the vehicle was listed as an authorized driver of the rental, which is another indicator, albeit perhaps a minor indicator, that criminal activity may have been afoot. *See United States v. Smith*, 263 F.3d 571, 592 (6th Cir. 2001). The inconsistences between Ms. Harris's and Defendant's descriptions of their travel plans are also entitled to some weight as an indicator of criminal activity. *See Townsend*, 305 F.3d at 543. While there may be any number of legitimate and innocent reasons for Ms. Harris to apologize to Defendant for speeding and the perceived change in her behavior when asked about a package in the car, some minor weight may also be attributed to these factors given Officer Duggan's experiences and testimony. I do not think handing all of the vehicle paperwork to Officer Duggan or quickly hanging up the phone should be entitled to any weight as factors because it is just as likely a failure to do so would have been listed as suspicious. *See Johnson*, 482 F. App'x at 145 (noting the Morton's Fork dilemma where either choice disadvantages the chooser).

Defendant argues, per *Bell*, that a series of relatively minor factors, taken together, cannot form the basis for reasonable suspicion unless they are accompanied by stronger indicators of criminal activity. *See Bell*, 555 F.3d at 540. In *Bell*, however, many of the factors were far more questionable than the factors at issue here. For example, the officers in *Bell* claimed they had reasonable suspicion in part because Bell was being overly cooperative, repeated a story that sounded rehearsed, held a cell phone in his lap, and failed to make eye contact. *Id.* Most of these factors are entitled to essentially no weight.

In my view, it is true that most of the indicators in the instant case are rather weak, could each have a perfectly innocent explanation, and might not lead to more than a "hunch" if considered in isolation. However, the individually weak factors gain strength in combination when Officer Duggan is permitted to draw on his own experiences and training to make inferences from the

19

cumulative information available to him. *See, e.g., United States v. Chapple*, No. 09-20224, 2010 WL 2817188, at *4-5 (E.D. Mich. July 16, 2010) (reasonable suspicion based on inconsistent travel plans, overwhelming smell of air freshener or perfume in the rental car, and the officer's experience and knowledge about the transporting of pills from one area of the country to another); *United States v. Fofana*, 1:07-CR-93, 2008 WL 474164, at *2-3 (E.D. Tenn. Feb. 20, 2008) (reasonable suspicion based on driving a rental car outside the area in the rental agreement, implausible travel plans, and nervousness, noting that "[i]ndividually, none of these factors is a crime, but together they could lead a reasonable officer using his common sense to have reasonable suspicion of criminal activity."). While it is a close call, considering the factors in combination, I **FIND** Officer Duggan had an articulable and reasonable suspicion that criminal activity was afoot to warrant a brief investigation by deploying the readily-available Red.[7]

### 4. Red's Alert Established Probable Cause

An alert by a properly trained and reliable drug dog "'is sufficient to establish probable cause for the presence of a controlled substance.'" *United States v. Howard*, 621 F.3d 433, 453 (6th Cir. 2010) (quoting *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994)); *accord United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012). Probable cause is defined as "'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion, and is said to exist when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place.'" *Howard*, 621 F.3d at 453 (quoting *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004)). If the police have probable cause to

---

[7] The scope and duration of the ensuing detention to investigate further are seemingly not at issue. To be clear, however, I also **FIND** the degree of intrusiveness to dispel the reasonable suspicion that criminal activity was afoot was minor as the dog and the backup were essentially on the scene and it took only a few minutes for Officer Duggan to deploy Red.

20

search a car for drugs, then they have probable cause to search every part of the vehicle and any containers found therein which were capable of hiding drugs. *Stubblefield*, 682 F.3d at 507; *United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006) ("an officer with probable cause to search a vehicle for drugs may inspect any item in that vehicle that could contain drugs, whether or not the item belonged to the driver, a passenger, or someone else claiming an expectation of privacy in its contents.").

Quoting this Court, the Sixth Circuit has held, "'the primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability.' This determination in turn rests almost entirely on the credibility of the dog handler's testimony '[b]ecause the handler is the only witness who can speak to the subjective interaction during a particular dog alert.'" *Howard*, 621 F.3d at 449 (quoting *United States v. Howard*, 448 F. Supp. 2d 889, 897-98, 900 (E.D. Tenn. 2006)).

The government put on credible evidence via Officer Duggan that Red was properly certified as a drug-detection dog at the time of his alert, which is all that is required for evidence of the dog's alert to be admitted on the issue of probable cause. *Diaz*, 25 F.3d at 393-94. Defendant has attempted to put at issue Red's training and health, but he has not succeeded in putting at issue Red's performance on the night at issue. Given Officer Duggan's credible testimony that Red was adequately and properly trained and certified and that Red's drug-detection performance was not impacted by his health, I **FIND** Red's alert provided probable cause for the search of the car. It is not necessary to belabor this point, however, as I also **FIND** that even if Red's alert did not constitute probable cause due to alleged health concerns, Officer Duggan had independent probable cause before he searched the vehicle based on Defendant's admission he threw marijuana from his

person into the grass while Officer Duggan deployed Red.  This admission and the discovery of marijuana took place before Officer Duggan's search and he credibly testified it was part of his probable cause for the search.

## III.    CONCLUSION

For the reasons stated above, I **RECOMMEND** that Defendant's motion to suppress [Doc. 22] be **DENIED**.[8]


s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).